Good morning ladies and gentlemen. As you can tell Judge Rogen will be with us by video. And the first case this morning is U.S. v. Cardena and Mr. McLeese are you arguing first? Richard McLeese May it please the court, my name is Richard McLeese. I represent Glen Llewellyn in this appeal. Mr. Llewellyn is a former Chicago police officer and housing developer who was charged here in two counts. The first was a RICO conspiracy count, the second a drug conspiracy count. The jury's verdict as to him was mixed. On the RICO count they were unable to reach a unanimous verdict, they hung and the government elected not to retry him on that count. On the drug count they found him guilty. This morning the issue that I intend to focus on is this, does the district judge's decision denying Llewellyn's post-trial motion for a new trial specifically on the quote unexplained wealth unquote issue serve to undermine confidence in the reliability and fairness of the jury's drug conspiracy? And because of the nature of this issue while the record in this case is of course voluminous, in many respects the relevant portions of the record on this issue are pretty tightly cabined. The judge's decision and she got voluminous, not voluminous but extensive supplemental briefings is at appendix A of our e-brief and her decision on the unexplained wealth issue had two parts. The first was she concluded on the basis of the evidence introduced and not introduced during the course of this 11-week trial that the government's arguments and evidence concerning Llewellyn's supposed unexplained wealth were improper. Mr. McLeese, good morning Mr. McLeese. The biggest problem for Llewellyn on the government's claim of unexplained wealth, it seems to me, is that quite a bit of the evidence explains Llewellyn's wealth as coming from legitimate sources, namely his real estate development business. So how do you explain how he was harmed by a very brief argument about unexplained wealth when his wealth was legitimately explained? Yes, Your Honor, and that's as you're cited in regard to saying that this evidence was not appreciably prejudicial because the judge said that it was inconceivable to her that this very troubled argument and evidence could have had an effect. And the reasons why, Your Honor, it's so important here relate to the, if not unique, highly unusual circumstances of this trial. Virtually all of the government's evidence against Llewellyn consisted of the testimony of cooperating witnesses, and cooperating witnesses who received benefits for their cooperation that exceed anything that I have ever seen in years of practice. Two of them got immunity, were involved in multiple kidnappings, running kilos of cocaine, and so forth. Another, as far as Umar, who was looking at life in prison potentially, got a total of four years additional to his state sentence that he was already serving. And the reason why this argument and evidence is so prejudicial here is that there's nothing unusual about relying on cooperating witnesses in a federal conspiracy case. That happens all the time, albeit perhaps not with the inducements that you have here. What is unusual is the lack of any of the usual kinds of corroborate evidence that one typically finds in drug conspiracy cases. As to Llewellyn, there were no audio tapes. As to Llewellyn, there were no videotapes. As to Llewellyn, there was no physical evidence. As to Llewellyn, there was no testimony from any victim witnesses. And so what you had is you had the jurors confronted with this uncorroborated testimony. Mr. McLeese, could you stay close to the microphone? I'm sorry, I'm not accustomed to it. I know it's a challenge, but that's where we're recording. Thank you. What you had here was reliance on uncorroborated testimony. And, Judge, what I think is really key here, and which the district judge did not consider at all, is what the jury actually did here as to Llewellyn. What the jury did is they hung on the refill conspiracy charge and found him guilty only on the drug conspiracy charge. I submit the most reasonable inference to draw from that is that the jurors were not unanimously satisfied with the testimony of the government's corroborating, I'm sorry, cooperating witnesses. Because if they had been, they would have found him guilty of the refill conspiracy charge. And the fact that they were not unanimously satisfied with that testimony, I submit, supports an inference that they were looking for some form of corroboration to hang their hats on unanimously. And because the types of corroboration that one ordinarily encounters in this sort of case were utterly lacking, the importance of this evidence is only heightened. And in fact, in this case, I believe it was a rebuttal argument, you had the government arguing at one point, money doesn't lie. On that point, Mr. McLeese, could you address one of the things that obviously was a major concern for the district judge? If money doesn't lie, the district judge found that most of this evidence, as I understand it, was properly admitted to the extent that cash was being used by Mr. Llewellyn for some rather unusual purposes. Well, at the risk of perhaps seeming like I don't believe that she ruled that it was properly admitted. I believe that what she ruled was that it was would have been admissible anyway. And the reason why, okay, I'm not complaining about judge. The reason why I believe that that is significant is I don't believe you can uncouple the evidence from the argument that informs it. If you look in these closing arguments, there is nothing said about circumstantial evidence, cash as circumstantial evidence of unexplained wealth. Well, I frankly don't understand the difference. It seems quite subtle and it's not clear to me how, well, how the difference it makes. Well, your honor, I think it makes a difference because what the jury's being asked to look at in terms of unexplained wealth is the full array of his financial dealings and wealth. And to infer from that because no coming, therefore he's guilty. With the cash, what you have is a much more narrowly circumscribed amount of evidence and you have a different theory of admissibility that requires a juror to believe that people are not going to engage in cash transactions unless they happen to be big time drug dealers or involved in large drug offenses. And this was a premise that the jury never had an opportunity to respond to because it was not the way the evidence was argued. The analogy that I draw in my brief, Judge, is that if you had evidence, other evidence, that was admitted at trial improperly for propensity reasons and then on appeal, the government was arguing, well, that's really harmless because some subset of that evidence would have been properly admissible as motive, modus operandi, whatever. Therefore, there's no prejudice. I think here what the judge is doing is she's considering prejudice not in terms of the argument and the evidence that was actually introduced at this trial, but some hypothetical trial. Well, it's about as, to me, it's about as similar as 404B evidence coming in for identity on one hand and modus operandi on the other. They're awfully close. Could you also address the fact that there was apparently no objection during trial to any of this evidence? There was no objection during trial, and I respond to that in two ways. One, as often happens, the government's evidence here and case, and I'm not faulting them, but it was something of a moving target. At the time that this evidence was introduced, the government had represented to the defense that they were going to be a comprehensive picture of Llewellyn's finances, and that is cited in my brief. Are you talking about the fact that the government had promised to introduce his tax return? No, that's separate. There was some confusion on that. That is separate. The government responded to the judge's concern about a possible Brady issue in one of their supplemental responses in the lower court, saying... Mr. McLeish, you can go ahead and respond to both Judge Hamill and Judge Roehner, but your 10 minutes are up. All right. Thank you. To further respond to your point, Judge Hamilton, the fact that there was no contemporaneous objection made was already taken into consideration by the district court judge when she applied the plain air standard at that stage. Right, and found no prejudice. And found no reason to upset the result of the trial based on this distinction between cash and wealth and evidence that came in without objection. That's correct, Judge. Okay. Thank you. Mr. O'Connor-Miller. Good morning, and may it please the court. My name is Leighton O'Connor-Miller, and I represent Hector Uriarte. During my time before the court, I want to try to address three issues with you. First, like Lynn Llewellyn, Mr. Uriarte was prejudiced by the improper introduction of financial evidence related to unexplained wealth, and the government then commented on that evidence and Mr. Uriarte's decision not to testify on his own behalf during closing argument. Second, Mr. Uriarte's trial was plagued with errors. The cumulative effect of those errors, even if no single one was uniquely prejudicial, the cumulative effect of those errors that was dealt with in Mr. Uriarte's brief was enough to create prejudice and deny him a fair trial. Third, an evidentiary hearing should have been held to determine if a juror who had broke down into tears saying that she was going to lose her job, an evidentiary hearing should have been held to determine if she was under such stress or external or internal coercion as to prevent her from being able to continue with jury deliberations. Initially, on the issue of unexplained wealth, the Carrera test requires that other evidence in addition to things like purchases, etc., must be introduced in order to corroborate the so-called unexplained wealth. The government promised during the trial, and that's in the record document number 1242 at pages 8 through 11, the government promised to provide Mr. Uriarte's tax returns for the years 2000 through 2009. In fact, the government even acknowledges that in their own brief at page 82. That never occurred. There was never any corroborating evidence. In both Carrera itself and in Campagna Case, Harris, additional evidence or testimony by the defendant actually did corroborate the government's claim of unexplained wealth. Here, there was no additional corroborating evidence ever introduced by the government. In fact, the only... What... If I recall correctly, counsel, we had the $100,000 cash investment, is that right? That's correct, your honor. About $100,000 for a car? That's correct. And... It was financed. It was $100,000. And a lot of cash loaned to people, right? Correct. In fact, I think... What else was there concerning Mr. Uriarte? Concerning Mr. Uriarte, I think it's on page 83 of the government's brief. They actually go through and they list out the different things that were introduced at trial. And it was... There was a trip to the Super Bowl. There's a separate... Two other cars as well and some jewelry. Okay. So we got big spend. There is... There is... There was spending. And given the relevance of large cash transactions, regardless of the wealth theory, what's the big problem then for Mr. Uriarte on the score? The big problem, your honor, is the financial... The unexplained wealth evidence is really the only evidence against Mr. Uriarte that doesn't come from a cooperating witness by the government. It's essentially the only thing the jury could look at. And bear in mind, this is... Why... Yeah. Why couldn't they? Given all these cash transactions and big spending around... And we've got the evidence about the false credit applications and the phony employment arrangements set up for him, right? He made an investment in the motor... Platinum Motors and is being paid a salary back... They put him on the payroll, right? So it looks like... And he then claims to the rest of the world that he's an employee, right? He does claim that he's an employee. He did invest in the company itself and he also had other positions as well. What the government was required to do, though, was provide something beyond just cash outlays as evidence to show that he could not have actually earned that money through legitimate means. There's no evidence whatsoever presented in the trial by the government, despite their own promise to provide the tax returns. There's no evidence whatsoever provided against Mr. Uriarte to show that he could not have earned the money to make those purchases. Mr. O'Connell Miller, I would like to take you to another issue and it's this, because I'm... I really want to hear what you have to say about this. Like the district... I mean, I want to hear everything you have to say, of course. Like the district court, I find the government's conduct in bringing witnesses to the courtroom window to identify defendants distasteful. But what ethical duty did this violate? How was it brought to the attention of the jury after each... Well, let's say for each witness that was affected? Your Honor, I would argue that the ethical duty obviously is you can't have coaching in any sort of an in-court identification. It's not clear. I think it was a DEA agent who was bringing to the courtroom, looking through the window, pointing out the defendants. The prejudice, even if it's not directly prejudicial, again, I think goes to this idea of cumulative error, that throughout this trial, you had about six different things that occurred. I would argue each of them was prejudicial, but you had an erroneous forecalls challenge during jury selection. You had false and contradictory testimony by the government's cooperating witnesses. Again, you had the witnesses brought to the courtroom window. You had the admission of the financial evidence. You had the issuance of the sovereign instruction at a point where it should not have been issued. And then finally, the failure to hold the rumor hearing on the crying juror. In addition to the government's commentary, again, back on the financial or unexplained wealth issue, the commentary that Mr. Iriarty did not rebut or provide any evidence of how he actually earned that money. To me... Excuse me, but as to the crying juror, Judge Gottschall told the CSO to direct the juror to tell the judge if the problem persisted. And it certainly would seem that the juror never raised the issue again, and the deliberations continued. So where would... Doesn't it seem as if Judge Gottschall handled that issue quite well? Your Honor, I would respectfully disagree. I think that Judge Gottschall... And this is a pretty simple fix. Did anybody ask her to do anything other than what she did with the crying juror? They suggested, and it really related as well to the sovereign instruction, that it was sort of the wrong, that there was coercion. Was there an objection on the record to the way the judge handled that situation? There was. At the end of the trial, Mr. Sullivan filed a motion on behalf of Mr. Iriarty detailing the issue. When it was too... After the verdict had been... After the verdict, but at the judge's request to get additional objections into the record, it was actually put in the record in Mr. Sullivan's post-trial motion. I don't know that there was a specific objection during the time of the crying juror. It also happened about the same time as the sovereign instruction where there were clear objections made by the defense counsel. In addition to cumulative error, I guess the last thing I'm going to talk about is this rumor hearing issue. Hall v. Zink requires where there's a risk of impartiality by a juror, requires that there actually be an evidentiary hearing. And to Judge Roedner's question, this is a pretty simple administrative fix. If you have a situation where you know that a juror is crying and that the reason that they're crying is they're afraid that if the deliberations don't end that they're going to lose their job, then it's a simple fix to bring that juror out and have a rumor hearing. It's not a difficult thing. It's not a difficult administrative change. But when you have a situation where somebody is under such either external pressure from their employer telling them you've got to get back to work or we're going to fire you, or such internal pressure within themselves of just fear that they're going to lose their job, it's reasonable to conclude that that juror is not going to be able to act accurately and impartially participate in deliberations, that that person would want to bring the deliberations to a conclusion as quickly as possible. I think finally on the cumulative error issue, just to touch back on that for a second, both United States v. Moore and Alvarez v. Boyd, you have to have at least two errors, and in total, the errors deny a fair trial. In this situation, we identified in Mr. Uriarte's brief, a total of about seven errors that occurred. While I would argue that each of them is uniquely prejudicial, I think that in total, the reality is essentially the only evidence against Mr. Uriarte that's not from cooperating witnesses is financial evidence. You have a series of other errors throughout the course of the trial, in total, and this was a complex trial, but in total, those errors resulted in a denial of due process for Mr. Uriarte. Thank you. Thank you, Cashel. Mr. Beal. Thank you, Judge. May it please the court. My name is John Beal. I represent Jorge Uriarte. I'm going to discuss the Jorge Uriarte's disparity issue and the Align issue with respect to Jorge and Hector Uriarte and Tony Sparkman. With respect to the disparity issue, the pre-sentence report found that Jorge was an average participant in this case. This is a case that involves some 18 players who I identified in my brief, yet Jorge got the longest sentence in the case, 60 years. The case included other people who engaged in horrific conduct and got much shorter sentences. In fact, Judge Gottschall commented, I mean, we've got these people who strike these incredibly dangerous to society and who are getting out of prison really soon. So you have comparable defenses with much shorter sentences. Now, some of them were cooperating and the judge is entitled to take that into account, but there has to be a limit to that. So in my sentencing memorandum and argument, this disparity issue was really the only one I raised. And Judge Gottschall, and the law requires the judge to take into account any substantial issue that a defendant raises, yet Judge Gottschall said that I don't know that I'm allowed to consider this. And she asked, what does the Seventh Circuit say? And I told her that she could consider it, but she concluded, I'm just not sure that I want to be considering those people. I just don't know. You know, Mr. Veal, you argue that the district court didn't understand it's her discretion to consider the sentences of the cooperating defendants. But she seemed to me to be saying that she did not want to consider those sentences because she considered them to be frightening and was attached to your brief. In other words, she knew she had the authority to compare, but she didn't wish to compare Jorge Uriarte's sentence to those of cooperating defendants, because those were skewed unusually low. And of course, as you know, distastefully low to this judge by their plea deals. But isn't that a more natural interpretation of this really experienced judge's remarks? Your Honor, two things. Number one, the law, the Seventh Circuit law has changed on this. There used to be, you could only consider compared to national things and so on, and that's changed. But you look at her words, she says, I don't know I'm allowed to consider any of that. I mean, that's on... That's before you told her she could, right? Yes, but she didn't acknowledge that she agreed with me. She said, I'm just not sure I ought to be considering these people. I just don't know. Well, but you made her aware of that case. Well, I told her, but the question is, did it make any impression? I mean, and you put her two she ought to consider that, and then in her... When she goes and imposes a sentence, she doesn't say anything. She doesn't address it in deciding and articulating why she's deciding to impose the sentences that she does. So you've combined her initial state, I don't know that I'm allowed to consider that, and then not talking about it, not stating what her then... But she gave coaching reasons for dropping the hammer on Jorge. He was... She maintained he was the worst of the bunch that went to trial, and that he had demonstrated no redeeming or mitigating factors. She knew she... It would seem she knew she could compare his sentence to the co-operators, but she was so disturbed by how low their sentences were that she just didn't want to do so. And I think that's the actual... Your Honor, that certainly is something she could have done, but what I'm suggesting is that that's not what she did do. It's not the logical reading of, I don't know that I'm allowed, followed by, I'm just not sure I ought to be considering. And that's, I mean, she's stuck in the old law. I mean, that's the most logical reading of what she actually said, because she then doesn't go on when she imposed the sentence and say anything about my single... She knows, I assume that as an experienced judge, she knows she's supposed to comment on the defendant's strongest contention or primary issue. Well, had those non-cooperating defendants been sentenced yet? Cardena had been sentenced and Sparkner had been sentenced, but she was well aware of, you know, she tried the case, for example, she went on to give Hector a leadership role, so certainly in her mind had to have been that Hector was a leader along with Rodriguez, and that the pre-sentence report says that Jorge's an average participant. So everyone had been sentenced, that's right, and there's a limit to who she has to compare to. All the cooperators had their sentences one way or another, and two of the defendants, other defendants have already been sentenced. Cardena got ten years. Well, that does make a difference when you're looking at sentences your client got versus the she didn't have those to compare with yet, even though, but she obviously, sometimes judges don't make up their minds until it comes out of their mouth. But I think she had a notion of, after a long trial, of comparative responsibility, even if, even for the ones who had been sentenced yet. So, I mean, I just, you know, Judge Romner, with all respect, disagree with your, what you intuit, putting her two states, I don't know I'm allowed to consider any of that, I'm just not sure I ought to be considering those people. She could have done what you suggest you think she did, but I suggest that's not what she in fact did, and that's not how she decided the sentence in this case. And the other thing I would simply add is that if you read her reasoning, she doesn't tie any of the sentence to any discernible 3553A factors at all. So, I'd like to- I beg your pardon? Well, she doesn't- This looked to me, frankly, counsel, like a very thoughtful, individualized sentence. Did she have to tick off through the 3553A factors? She didn't tick off any of them, is what I'm saying, if you read through it. It's really, it is thought, and I'm not saying it's not thoughtful, but she's supposed to connect it to the factors, and, you know, you can sort of try to intuit which factors might be applicable, but she didn't say so. So, I'm just saying, I mean, that's just, that's an additional consideration. But that's not my main point, but she is supposed to connect it to 3553, and I suggest she did that inadequately. The other issue is the Align issue. The government acknowledges that there was an Align error for the three defendants, and- How can Jorge demonstrate that he was prejudiced by the Align error? The court seemed to decide that a 60-year sentence was appropriate, then she worked somewhat backwards to fit it into the mandatory and discretionary portions of the sentence. Well, Judge, it seems to me that she was starting from a 32- she knew she was starting from a 32-year base, and then she came up with 60. The question is, if she had known she was starting from a 30-year base, can this court say with confidence she would not have reduced the sentence at all? Because it doesn't have to be, we don't have, it isn't that she has to have reduced it by two years. The question is, should she have had to reduce it at all? I mean, would she have decided to reduce it at all? And I don't think we can put ourselves in Judge Gottschall's mind and figure whether she would have made any reduction if she'd known she was starting from 30 rather than 32 years. Mr. Beal, I'm starting from the premise that there was sufficient ample evidence to convict Jorge Uriarte of using or carrying a firearm under these circumstances in connection with a drug trafficking offense. Could the jury rationally have found him guilty of that without also, in essence, finding that he brandished if they had been asked that question? This all stems from the Avila kidnapping, right? There was a lot of confusion about what happened. I mean, in this case, there was a lot of confusion, but it was readily apparent during the trial. And so they could have found him essentially being merely present. And theoretically, you know, on a Pinkerton ground, they perhaps they should have found him, but if they had found him merely present, they might well have not found him to have brandished. And I would finally say that the analysis we believe the court should apply is the analysis of the Lewis court, the M-Bank Third Circuit, as opposed to Plurality, concurrence, or dissent? The plurality is very well reasoned. And so the question is not whether the jury would have convicted, but rather whether it's clear that Judge Gachot would not have reduced the sentence at all if she had known it was a five-year record, not a seven. I guess on that issue, I was certainly interested to see what the Third Circuit has had to say about the Elaine opinion in this context. But also, these are issues pretty similar to problems that we've faced in the wake of Apprendi. And that's why I was asking you about whether a jury could rationally have convicted him of only using and carrying. Because I think that's the kind of approach that our court has taken with Apprendi errors. And I would think the same applies to Elaine errors. But I'm hoping to learn some things this morning. Your Honor, I think they could have rationally either convicted or not convicted, the way juries reasonably operate. But I agree with the Third Circuit that this would be, applying it in the sentence context, would be an Apprendi violation. It's not a trial error. It's a sentencing error. I think their analysis is correct. Thank you. Thank you, Mr. Gale. Mr. Gable? May it please the Court. My name is Andrew Gable, and I represent Tony Sparkman. Tony Sparkman received a 42-year mandatory minimum sentence, which the trial court stated she would not give to him if her hands weren't tied. Twenty-five of those years were based on his conviction for the Pedro Avila kidnapping. That conviction stemmed from an unduly suggestive photo array that was shown to Pedro Avila. That was the photo array that had six African-American individuals. Five had a South background, and Mr. Sparkman had a two-tone background. The agent had testified that the photos were taken from mug shops and from driver's license photos, and it's submitted that a two-tone photograph does not come from a driver's license, leaving the only assumption that that was a mug shot of Tony Sparkman. Mr. Avila never identified Tony Sparkman in court. He was never asked to identify Mr. Sparkman in court, and that is particularly troubling when the government was bringing witnesses to the rear window of the courtroom to identify witnesses before, and Tony Sparkman was the only African-American defendant at this case. Can I take you, here's what I'd like to know from you, please. You argued in the brief that your objection to the admission of the photo array is somehow different from moving to suppress the photo array, and what I'm wondering is how so, because the effect is the same. You did not want the photo array to be admitted as evidence. If that is the case, then I would think that the failure to move to suppress pretrial was a waiver. Your Honor, correct, there was no pretrial motion to suppress. The argument submitted here is the objection at trial was not to prevent Pedro Avila from testifying at trial, or from Pedro Avila being asked to identify anyone at the trial if they're standing up and saying, that's the man who broke into my house. Further, with that exhibit 376 in the record, there was a lot of confusion when they first attempted to introduce it, because apparently the agents first showed 100 photographs or so to the witnesses and Mr. Avila, and then at trial, they attempted to submit just six photographs. So, if it is considered a motion to suppress, my argument is that there was good cause for not raising that prior to trial, because there was surprise when it just came up at that moment during the trial. I mean, the trial court didn't ask, you know, why wasn't this raised before, and the government never objected under Rule 12 or was claiming that this needed to be brought up before trial. And with that photograph that was not shown to Mr. Avila until two years after his alleged kidnapping, and then it was never confirmed with any sort of lineups, and it was performed and shown to him by the case agent who arrested Tony Sparkman, and who was the case agent on this case. And that was the only non-cooperating witness or evidence against Tony Sparkman. And the cooperating witness for this count, the Pedro Avila kidnapping, the jury did not credit him when they acquitted Tony Sparkman in count four, when this cooperating witness Flores also testified against Mr. Sparkman. And then, related to that, so why again wasn't it raised prior to trial? I cannot speak to that, Your Honor. I did not represent Mr. Sparkman at trial, and to be clear, I'm not making any sort of would foreclose any collateral proceedings on that issue. But at trial, there was, in the record, some surprise about the actual exhibit that was shown to Pedro Avila, the exhibit 376. And there was a lengthy sidebar about 100 photographs or photographs of people of different races, and the trial court had even mentioned that if he was shown pictures of people of different races, there would have been a motion to suppress before trial. Mr. Cable, I guess, could you summarize for us why the extensive cross-examination of Mr. Avila about the reliability of this identification was not sufficient to present the issue fairly to the jury? I think because even if Pedro Avila, at that moment, believed that that was the person who broke into his house, it can't go back after the fact that he wasn't shown it for two years and that it was a different colored background than the other photographs he was shown. And without being able to address those issues earlier, cross-examination is not going to be able to cure that error. Thank you. And I would like to ask you one more question, if I might, because I didn't understand your argument that the testimony of Officer Healy regarding Avila's identification of Sparkman was improper bolstering. Because what I'm trying to figure out is how did that testimony bolster the identification? It seems to me that it simply repeated the identification. The officer didn't vouch for Avila, for example, or do anything that we typically consider bolstering. I think just the mere fact that they were able to use an agent to repeat the identification would be bolstering. There was no reason for that agent to testify, and the mere fact that he was able to get up there and essentially repeat Avila's testimony bolstered the fact that Avila never identified Sparkman at trial. Why can't the government offer such evidence about the circumstances of the prior identification to rebut attacks on its reliability? I think they can give some testimony about the circumstances, but I believe the case law is clear, though, that they can't testify about the actual identification unless the making that identification, and here Mr. Avila did neither. Did Agent Healy, what exactly did he say that you think amounts to repeating the identification? Essentially by going through that, he talked to Mr. Avila, and he asked him to describe the process, and he asked him to initial the photo of the person he identified, correct? Yes. And that's where it stopped, or did it go on from there? That's where it stopped, but the implication there is that Avila identified Mr. Sparkman then. He didn't say the magic, Healy didn't say the magic words, and then Avila said this is the man who kidnapped me, but they were able to show the picture that he had Mr. Avila's initials on, which to me would be the same as testifying that Avila identified Mr. Sparkman. Thank you, counsel. Thank you. Ms. Winslow? Good morning. May it please the court, I'm Heather Winslow, counsel, on behalf of Robert Cardena. I've raised three issues in the brief, but I'd like to focus on the issue regarding the admission of testimony suggesting that Mr. Cardena offered to cooperate with authority. As we brief the issue, this was a hearsay statement that was intended to curry favor with authority. It should have never been admitted, and it was prejudicial to Mr. Cardena. The government has responded that this is the type of statement that shows a consciousness of guilt and is therefore irrelevant. However, in this case, the factual circumstances of the event that led up to the testimony set it apart from the cases the government cites and make it an irrelevant statement unduly prejudicial to Mr. Cardena. This all began when law enforcement officers approached Mr. Cardena in his home. They came to his home, told him he was not under indictment, he was not to be arrested, and asked him whether he'd be willing to cooperate. At the time, they exchanged telephone numbers, but no commitments were made. And then Mr. Cardena later contacted the law enforcement agents and told him that his lawyer had advised him not to cooperate and not to speak with the agents. About 10 months later, the agents came back to Mr. Cardena's house. Again, Mr. Cardena was not under arrest and was not necessarily under investigation, but he was being subject to repeated visits from law enforcement officers. At that time, according to agents' testimony, Mr. Cardena made the offer if there was information he could provide that would help him out. The government suggests that this is consciousness of guilt or involvement in this particular conspiracy. However, the sanitized statement that came before the jury is nothing more than a question to agents whether if he provided some cooperation or provided some information, they would leave him alone. In light of the very, very weak evidence against Mr. Cardena during this trial, the admission of this statement, particularly in its sanitized and thus irrelevant, and I'll return to that, form, was unduly prejudicial. The testimony against Mr. Cardena, as the court is aware, was essentially limited to the testimony of one cooperating witness, that would be Mr. Flores, and with one theoretically corroborating statement from the agent, the case agent, who stated that Mr. Cardena told him that he robbed the Joliet House of Cocaine. That very limited testimony in this case was, as we've also argued in the brief, we believe insufficient to rise to the level of beyond a reasonable doubt. But altered as it was by this hearsay statement that should not have been admitted. Counsel, you keep calling this hearsay. This is a party. It is a party, Judge. However, it is not a statement against interest. It doesn't matter. It's simply being offered against him. That's enough, isn't it? It is not, Judge. And this court has found in Najeeb, in the case of Najeeb that was cited in our brief, that when statements are made with the intention of currying favor with authorities, those statements, in fact, do not fall under the hearsay exception, and they are not admissible. In this case, the best characterization of this statement could be that he was intending to curry favor with authorities so that the agents would stop coming by his house and harassing him. That was his position at the time. In addition, the government also argued that this statement could not be hearsay because it was, in fact, a question. However, in the next page, in the next page of the government's brief on page 121, the government acknowledges that this statement, although not as it was presented to the agent, was an offer to cooperate. And that offer to cooperate is most certainly a statement intended to curry favor and a statement which does not fall under the exception to the rule. Finally, Your Honor, there is one additional factor about this case. This statement became irrelevant and, therefore, should not have been admitted. And the irrelevance, certainly, the prejudice certainly overwhelmed the relevance in this case because it was sanitized to preclude the names of any other defendants. The government alleged that the original statement was an offer to cooperate or provide information about the Uriarte brothers. However, in order to meet the requirements of Bruton, the names of the other defendants were taken out. Thus, the jury was simply left with the impression that Mr. Cardino had information about criminal activities that would tie him to criminal activities and he could cooperate. In light of the very weak evidence against Mr. Cardino, we believe that this was unduly prejudicial and along with accumulations of errors that my co-counsel have discussed, deprived him of a fair trial. Counsel, can we go back to the Naguib case for a moment? Certainly, Your Honor. Wasn't the challenge testimony in that case testimony by a co-defendant? It was, Your Honor. So the party admission, the party statement exception was not applicable there. Your Honor. Here, your client's statement was being offered against him. However... So that would seem to be directly applicable. However, in Naguib and also in the Supreme Court case, Williamson, one of the considerations is whether or not statements were intended to curry favor and I would also... Obviously, that's a huge factor when other people's statements are being offered against a defendant. That is correct. And you're saying that same principle, that same standard has to be met when a defendant's own words are being offered against him? If they're being offered under that exception, yes, Your Honor. That is our position. Okay. Thanks. If there's nothing further... Thank you, Counsel. Ms. Kastner? Good morning. May it please the Court. Andriana Kastanek on behalf of the United States. The defendant's convictions in this case stem from their participation in a conspiracy to obtain drugs and drug money through robberies, kidnappings, and violence. One of those defendants was Glenn Llewellyn, who was a former Chicago Police Department officer who correctly used his influence and violence to get proceeds. Part of the government's very substantial case against Llewellyn concerned some limited evidence about his possession and his use of those proceeds. That evidence was probative. It was direct and circumstantial evidence of his participation in the conspiracy. The evidence at trial established that he took in more than a million dollars in cash from his participation in robberies. There were approximately six robberies in which he participated. There was testimony at trial that for each of the incidents in question, he generated cash from the sale of narcotics by his co-defendant, Saul Rodriguez. All of those proceeds were... Ms. Kastanek, why did the government promise that it would place into evidence tax returns for Hector Uriarte and Glenn Llewellyn and then fail to do so? The court very clearly conditioned the admission of the unexplained wealth evidence on the government's promise to meet that third Carrera factor, evidence that the money was not acquired legitimately. Without the tax returns, how much evidence was there for each of these defendants that the money was not legitimately acquired? It is very important to take these defendants separately. There was an objection made by Hector Uriarte during the trial to the admission of evidence of his receipt and use of proceeds from the conspiracy. It was briefed. It was in writing. There was a very fulsome discussion on the record with the district court in which the government represented that it would be meeting the prongs of Carrera. With respect to his source of so-called legitimate income for this spending, you're right, Judge Roedner, the government represented that it would be introducing three sources of evidence with regards to what his income was. His tax returns, a mortgage application, and financing applications for a vehicle. By contrast, there was no such discussion ever in the record with regards to the wealth. It is just simply incorrect that there was any objection or discussion of this issue with respect to the wealth. He did not join in Hector Uriarte's objection. There was no written motion by him or joining of Hector Uriarte's written motion. There was no discussion on the record at all about it. It's important to put that into context. The reason why is starting an opening statement. Llewellyn's attorney embraced this theory with regards to him being a successful business person who ran a home building business. His whole theory of the case is that Llewellyn and his co-defendant, Saul Rodriguez, were involved in business dealings together and had a rift with regards that home building business that explains Rodriguez's testimony against him. That is his theory of the case. It's the reason why I believe that there was no objection made to the admission of this evidence. That's an important distinction because I recognize your concern about the government offering to put in the tax returns with respect to Hector Uriarte and not doing it, but that's not the case for Llewellyn. With respect to Hector Uriarte, I understand the defense to be complaining that the government made a promise that it didn't fulfill with respect to the tax returns. The evidence that was introduced about Hector Uriarte's income was more than sufficient to satisfy the prerogative. So he had filled out mortgage applications in which he stated what his income was. He claimed income from Platinum Builders. He did the same thing on vehicle financing applications. And when that evidence was in the record, coupled with the testimony of the owner of Platinum Records who said, no, Hector Uriarte was never legitimately employed here. He was not legitimately on the payroll making money. This was a money laundering operation in which I agreed to basically take in money and generate paychecks for him. After that evidence was in, there was no need to introduce tax returns of Mr. Uriarte to establish the limitations of his legitimate income. There was no legitimate income by his own previously false statement. With respect to Hector Uriarte, I understand the defense to be complaining that the government can get up in an opening statement, promise the jury that the jury will hear something, and then if the government is fortunate enough to have some of that come in by other means, the government can just forget about the promise to the jury. Is that what you're arguing? I want to be very clear. If my memory serves me correctly, there was no discussion in opening statement by the government of tax returns. The discussion in question was one with the court without the jury present in the room in response to a written motion that Hector Uriarte's counsel filed challenging the admission of this evidence. There was a motion. There was a motion here in the house of the court at which the government represented here are the pieces of evidence about the limitations of his legitimate income that we are going to present to justify this theory of proceeds. But I do not think that there were any promises made to the jury on this subject, if my memory holds. With respect to Llewellyn, just to finish out that conversation, the evidence at trial established that he was taking very massive amounts of cash proceeds from this criminal scheme. And the testimony from Rodriguez as well as Umar was that that was being generated in the form of cash. So they would get drugs, sell the drugs on the street, common sense is that that's been turned over to them in cash. And the vast majority of the evidence introduced without objection from the defense as to Llewellyn's possession and use of those proceeds was that he was investing them in his business almost as a form of money laundering. So he was paying subcontractors, excavator contractors, flooring contractors, et cetera, with cash that the characteristics of that cash made it very probative. We're not talking about him going to the bank, depositing cash, taking it out, putting it in a briefcase in the neat way that you would if you're legitimately dealing in cash. We're talking about cash that was well-sourced, random denominations, in paper bags, found in rubber bands, all in circumstances in which these witnesses testified it was very unusual to be using cash. And that's probative. It indicates just like in a case where you're linking up a particular piece of stolen property with somebody's possession or use of it, it's probative. It indicates that he got that through illegitimate means. The defense focuses on a few pieces of evidence, very limited pieces of evidence, about his use of non-cash in this case. There are two pieces of evidence that I think are in question. There's a $1.2 million investment in a subdivision in the Chicago suburbs. And then there was a purchase of an excavator that was somewhere around $125,000. The government's theory of the case presented from the very beginning in opening statements was that Llewellyn had ceded his home building business with money from his criminal proceeds. So he had a $51,000 salary as a Chicago Police Department officer. There was a very significant discrepancy between the amount of money that he earned legitimately as a police officer and the sums that he's talking about or making investments with. $1.2 million versus $60,000 is a very large discrepancy. As a fair inference that the government was asking the jury to draw is that that discrepancy was the result of his participation in the conspiracy. MR. LOGSDON. Counsel, with respect to Llewellyn, did the government tell the court or defense counsel that you would be offering the financial summaries or his tax returns? MS. A discussion either before or during trial where the government had turned over, it had conducted a financial analysis by a revenue agent and it had turned over that analysis. I think the assumption was that it perhaps was going to be introduced. That discussion, I believe, if my memory serves, was a private one between the government and defense counsel. I do not recall any place on the record where this was discussed. And even if there was some discussion of it, it was not in the context of unexplained wealth. So because there was no objection waged against the introduction of that evidence, there was no discussion of this in the context of justifying the introduction of that. MR. LOGSDON. The district judge seemed very troubled by this. Was she incorrect about that? MS. A. She certainly was expecting it. MR. LOGSDON. I assume that was based on something. MS. A. Well, I thought that it was based on, you know, the pretty comprehensive discussions that were had in the context of Hector Duarte's unexplained wealth evidence, which, as I said, is distinct. And the court found, you know, there was no discussion of this with respect to Lewallen specifically, which is why she applied a plain error standard of review in evaluating that evidence or the introduction of that evidence.  GOTTLIEB. Ms. Kostanek, what is the best evidence against Lewallen that does not involve testimony from a cooperating co-conspirator? If we exclude the testimony of the cooperating co-defendants and we also exclude evidence of unexplained wealth, what is left? MS. KOSTANEK. Well, I'm not sure why you would exclude the testimony of cooperating co-defendants, given that there's no challenge to the introduction of that evidence. There, that was the case against Lewallen. So, the unexplained wealth, for lack of a better term, or his receipt. GOTTLIEB. I'm responding, I'm asking because of Mr. McLeese's argument. That's why I'm asking. MS. KOSTANEK. Okay. The unexplained wealth, as you know, was a very limited part of the case against Lewallen. There were seven cooperating co-defendants or co-conspirators who testified against Lewallen. They gave direct testimony about his participation in approximately upwards of six robberies or kidnappings in which they obtained drug proceeds by violence. So, two of them had immunity. The other five were cooperators insofar as they had received certain benefits for their testimony. The jury was properly instructed on how to consider the testimony of cooperating defendants that they had received benefits in exchange for their testimony, and the jury chose to nonetheless credit their testimony and to convict. GOTTLIEB. I'm going to ask, okay, what is the best evidence against Lewallen that doesn't involve the testimony of these cooperating co-conspirators? Is there anything else here? MS. GOTTLIEB. The case against Lewallen was based on the testimony of seven co-conspirators and the evidence of his receipt and use of proceeds. That was the evidence against him, Your Honor. There was corroborating evidence. It wouldn't in itself sustain the verdict, if that's what you're asking. You know, there was evidence about his perjured testimony in a prior case. There was evidence about his cooperation agreement with Rodriguez when he was a Chicago Police Department officer. You know, there's corroborating records kind of at each stage of his involvement in the conspiracy, but the bulk of that testimony, as is true of all of the defendants here, really, was provided by co-conspirators, and that evidence… I want to ask you, why were witnesses brought to the courtroom window to see who they could identify? In the brief, the contention is that most of those witnesses had long-term relationships with the defendants, could easily identify them, and so there was no harm. But that really begs the question of why this, what I consider an unseemly display, happened in the first place. I would appreciate your explaining how that decision was made, what the government was hoping to gain from this practice, and if this is, indeed, a regular practice by the government. Your Honor, the record does not indicate why. I'm happy to address the reason why, but it's not reflected in the record. I will say that the opening statement indicates that there were some substantial changes in certain defendants' appearances between the time of their participation in the conspiracy and the time of trial. So, for example, in the opening statement, there were pictures that were shown of these changes in their hair, changes in their weight, that the, I think, logical explanation for would be an attempt to substantially change their appearances for purposes of making identifications, but that is not something that's discussed in the context of the courtroom window identifications explicitly on the record. With respect to whether this is somehow a regular practice of the government, the answer is no, it is not done routinely. I think that the government recognizes that identifications, in-court identifications, should be spontaneous. They should not be something that's rehearsed, and so there is some concern there, as this court noted in court. The substantial difference between the prior case in which this court has addressed this issue and the present case is, in court it was a bank teller. It was the individual who had seen the defendant for a period of a minute, maybe a few minutes, and then was asked to make an in-court identification after that. In this case, this courtroom identification process was used for seven individuals, as disclosed in a letter to the defense that's talked about in the post-trial motions. Four of those individuals made in-court identifications. All four of those individuals had long-standing social and business relationships with the defendants, where there is no concern about there being a misidentification or somehow an impact on the nature of that identification. So, in fact, three of those people were co-conspirators. Lizette and David Venegas and Andres Torres, they engaged in crimes with these defendants, so there's no risk of mistaken identification. Turning to the issue of cumulative errors, I understand Hector Ilarte's counsel to be arguing that there are a series of errors that cumulatively compromised the process of evidence and the identifications that were made. There are no cumulative errors. There's not even one prejudicial error that he can identify, so one of them was the courtroom window identification that we just discussed. He also mentioned briefly this claim that the government put on knowingly false testimony, and I want to make sure that this is clear. There was no knowingly false testimony at trial. The defense identified two examples of it, neither of which rise to a level of knowingly false testimony. In fact, the Vega testimony about the issue of the dead body is something that the government didn't even introduce. It was elicited during cross-examination by defense counsel, not put on by prosecutors. It's hard to imagine how that would rise to the level of knowing presentation of perjured evidence. There are a number of juror issues that are raised by defense as well. You're not suggesting, though, that the government does not – that if the government knows that cross-examination answers are false, it doesn't have an obligation to correct those? Yes, Your Honor. I would certainly not be suggesting that, but just that this was not presented by the government. It was elicited by the defense, both with respect to Mr. Vega and Mr. Rodriguez, to kind of catch them in an ah-ha, you have a difference in memory about this. And the transcript or the testimony of Vega makes it very clear that at the time that he remembered this dead body in a location where he had been kidnapped, he had been tortured for a number of days. He had been – like, within inches of his life, he had been almost drowned to the point where both he and his companion had thought that he was dying. And so there are explanations for kind of differences in memory and differences in what people see that are far short of there being actual perjury that are knowingly false testimony in question. If I may, I'll turn to the issues with respect to the juror. There was a challenge or an objection to a four-cost challenge by the government to Juror 24 during the jury selection process. There is no doubt that the defendants are entitled to an impartial jury, both constitutionally and statutorily. There is no navigation that they had anything but. The jury that convicted them was undoubtedly impartial. There's no challenge to the people that actually were sitting that convicted him who returned guilty verdicts. And this court has said that in that situation, there's no remedy for even an improperly dismissed juror during the four-cost process. Is the government going to use all of its preemptory challenges, or could it have used a preemptory challenge to remove Juror 24?  The four-cost challenges were ruled upon prior to getting to a point where the government was actually exercising its preemptory, so I don't think there's any doubt that that could have happened. I don't think that it was necessary to get to that point in light of Juror 24's untruthfulness in direct response to questions that were posed to him during the course of the voir dire process. With respect to the juror who relayed to the judge through the CSO that she was having problems with the length of deliberation, it is suggested by Mr. Uroje's counsel that this somehow compromises the verdict because they were forced to go back and deliberate, and I think that a close review of the record indicates that the district judge took proportional action in response to this. What's the time sequence when the juror was, when the CSO addressed the juror crying and so forth? Yes, Your Honor, the jury began deliberating on January 17th. On the 26th, so nine days later, the jury returned a noted question saying that they had voted and were unable to reach a verdict on some of the counts. At that time, the judge announced to the parties that the day before, the CSO had told her about the crime juror. He had relayed to her that there was one individual who was worried about the length of deliberations and she, as a judge, told the CSO to say, you know, if there's a continuing problem here, have her come to me. As of the 26th, she had not come forward.  The judge told the parties that what she had told the CSO, she relayed to the parties what her conversation with the CSO was. And what she said is, I told the CSO to go back and tell the juror, if there is a problem here, please come to me. And the record reflects this. And wasn't she offering to contact the juror's employer herself? She may have been. She may have also been offering to do that. I think a review of the record indicates her intention was that if the juror came forward with concerns that there would be an in-court proceeding to discuss those. With the parties present, there would be some sort of hearing at which that juror could present her concerns. And that juror never did so. And what the court found very reasonably is, you know, that information was either something that dissipated or it's something that was said kind of in the heat of the moment that wasn't an actual prevalent concern in question. And then on that same day, the 26th, the court gave silvered instruction, you know, over objection by the defense that no request for a hearing or otherwise bring that juror in for questioning. Counsel, have you seen the separate brief that was filed by Jorge Uriarte, the handwritten one? Yes, Your Honor. I thought he indicated, you've made the point that nobody asked for this so-called Remmer hearing. And I thought he was saying, he thought somebody did. There is no request in, at the time, on the 26th, when this issue was occurring for a Remmer hearing. I believe that after the trial, this was raised for the first time. I believe that it was raised then in post-trial brief for the first time that there was a request for a hearing. There was undoubtedly an objection to the giving of the silvered instruction by the defendants. They said this would be coercive in light of the concerns about this particular juror. The court in response made the factual findings we just discussed and said, I don't see any concerns here. And there was no request to do anything further. And, you know, Remmer is a very specific case. It is about external influences on the jury. And there's a reason for the rule in Remmer, which is when there's an external communication with a juror, it is presumptively prejudicial. There's no reason for somebody to be having contact with a juror in the course of ongoing deliberations. And so there's a presumptive due process violation. This court has made that distinction between external and internal communications where there's a problem intra-jury. You know, a hearing is not something that's rebuttably presumed to be necessary. And this case, I suppose, is analogous to the internal problem. But I don't even think it rises to that level given the minimal issue that we're talking about here. If I may turn to the issues that are raised by Mr. Cardina with respect to his post-arrest statement, I think there needs to be a clarification of the facts that were presented by his attorney. There are three statements that were introduced that were made by Mr. Cardina. Pre-arrest, at the time, after certain individuals had been arrested in this case, but not Mr. Cardina, the agents approached him. They said, we want to talk to you about kidnappings and robberies that were done in this case. Mr. Cardina said to them, you know, I did not participate in any kidnappings, but yes, I was part of a robbery in Joliet of cocaine. He explained the situation to them. They asked him if he would like to cooperate, and he said yes. And so they arranged for an exchange of phone numbers and discussed the possibility of him coming into the U.S. Attorney's Office to cooperate. That evening, he called one of the agents and he said, you know, I talked to my attorney, my attorney advised me not to cooperate, and that was the end of that conversation. Eight months passed, and he was arrested in January of 2011. So at the time that he gave the third statement that's in question, that's being challenged here, he was being arrested. So he was being handcuffed. The agents had been instructed not to question him because he was represented at that time. He spontaneously said to the agents at the time of his arrest, would it be helpful to me to cooperate? Something along those lines. Again, so you're watching. One of the agents' questions was the same person that he had talked to eight months prior, and it indicates that he was cross-referencing that earlier conversation with that agent. That is probative evidence, as the district court held it. That is, as other circuits have held in context of discussing offers of cooperation, that is, it indicates that he has information about these other individuals in the context in which he's referring to them, which is in the context of the Juliet robbery that he already had committed to. It's not hearsay, as Your Honor noted. It is a statement of a defendant. That those are two separate exceptions to the hearsay rule, a statement against a penal interest, and a statement by the party of comment are independently admissible, and this case falls into the latter category. There is no reason to question its reliability. There is some suggestion by the defense that after it was brutalized, so it was standardized of references to Eurarties, given that the joint trial question, that it sometimes now I actually think the opposite is the case. It indicates that his statement loses a little bit of relevance by saying, well, I have information about others. Would that be helpful to me? But it's important to note that the government, in response to these burden issues, actually moved to separate Cardina from the trial. It was done in October of 2011, right before trial. They suggested that because of possible issues with prejudice from burden, they would be a separate trial for Cardina. In response, he objected to the severance, and that would have dealt with these issues of which he now complains, but he invited a joint trial at which this became an issue that he now complains of, and he invited and waived that issue. Ms. Sparkman raises issues with respect to the identification that was made by Mr. Beale. Could we go back to Cardina for a moment? Because you've argued that his offer to cooperate is admissible because it shows a consciousness of guilt. And the Seventh Circuit hasn't yet decided that issue, but the three other circuits have found these statements admissible and probative of consciousness of guilt. But, of course, the district court simply said that his statement was inculpatory and that it was an admission against interest. So, my question to you is, is it necessary to decide this on this new theory of consciousness of guilt? Or, I mean, do you not agree that the statement was inculpatory? I believe it was. I'm not sure that I see the distinction. It was inculpatory, and maybe one of the reasons why is because it shows consciousness of guilt. He was saying, I have information about these individuals related to the subject that we previously discussed, which is the robbery. So, it indicates he was a participant in that robbery. That is inculpatory. And I suppose in addition to that, it shows that he has consciousness of his own guilt and an understanding of the implications. With respect to Sparkman's identification by Mr. Avila, there was no objection on this ground at the trial court level. There was an objection made at the time that Avila was on the stand. The government had asked Mr. Avila about a photo array that was shown to him. There was an objection, and then there was a sidebar. And there was about a six-page discussion on the record with the district court about the particular photo array in question. The objection was a foundational one. So, what the defense counsel said at sidebar was, Mr. Avila has not yet testified that he actually was shown a photo array of six African Americans in which he identified an individual. The government said, okay, we'll establish that foundation. And the court directed the government to establish the foundation, which it did. There appeared to be some confusion on the part of the defense about the particular photo array in question. But there's no doubt that when you read the record that there was not an objection made on the grounds that are raised here. It was suggested that the background was a different color, the last is in memory. All those things that are raised now were not an issue at sidebar. There was- Well, forgive me, but I'm a bit concerned that Healy told the jury that he asked Avila to initial the photo of the kidnapper, and then the jury was presented with Sparkman's photo containing Avila's initials. I mean, that doesn't seem any different than Healy telling the jury Avila identified Sparkman and that is hearsay, right? There is an exception in 801 specifically for this category of testimony. 801B13, I believe it is, says that an exception to hearsay is for statements of identification where the declarant is available, subject to cross-examination, and also testified. That's exactly the case. This is something the court addressed, for example, in the Foster case. It's addressed numerous times that agents are permitted to testify about these types of lineups. The important distinction about this case is even if that weren't- I'm talking about the initials. Right. The initials are, for lack of a better term, a statement by Avila identifying an individual, and that falls within 801D's exception to hearsay. It's not hearsay. It's a statement of identification of an individual. I think that that resolves the issue if your concern is a hearsay one, where a declarant, in this case Avila, is present, subject to cross-examination, testifies on his own, the introduction of his hearsay statements, the initialing of the photo identifying the individual are admissible from basically a third party, which in this case would have been Officer Healy. With respect to the allegations of the suggestiveness of the photo array itself, all of these issues that are currently complained of were subject to very extensive cross-examination by the defense attorneys. They cross-examined Avila for a lengthy period of time about lapses in his memory, his ability to observe the first people that robbed him and really get a good look at them, whether the lapse in time somehow compromised that, the background issues. They also cross-examined T.F.O. Healy about these same subjects. These are the types of subjects that do not warrant a motion to suppress, even if one had been brought, which it didn't, but are properly flushed out by cross-examination, and the jury was presented with that information and was permitted to credit or discredit it. I also would note that even if you were to throw out Avila's identification in this case, there is substantial evidence to support this particular count. There are a number of co-conspirators who testified as to Sparkman's role in this robbery. Those individuals or those co-conspirators include Rodriguez Pedro Victoria, as well as Andre Flores, who testified specifically about Sparkman's participation in the Avila conspiracy more generally. I'll turn to sentencing issues, if I may. The first one I'll address is Jorge Uribe's allegation with regards to the procedural impropriety in his sentence. I understand their argument to not be a substantive challenge to the reasonableness of his sentence, despite some of the arguments that were made today here, but rather a procedural one, that the district court did not understand her authority to take these other sentences into account. And I very much agree with Judge Roedner that the record indicates that she well understood what these other sentences were. It's important to put this into context. Prior to sentencing, the defendant filed a sentencing memorandum that said that he wanted the court to take into account the sentences of the individuals who had already been sentenced by the court. He identified seven individuals, Ferris Umar, Andre Flores, Jorge Lopez, Saul Rodriguez, the Venegases, and Ray Cockrell. The last three individuals had received immunity. The other individuals received 11 C1C deals. And that's important because they're not just normal cooperation deals. 11 C1C deals constrain the discretion of the district court. So for these particular seven individuals identified by the defense, there was either a range of sentences that the district court was permitted to enter into, or there was a specific six-sentence in question. And counsel, these were all before Judge Cottrell? Yes, sir. And she had already? Um, I believe that one of, I think that George Lopez was a, let me look to be sure, I'm sorry. There were, oh, yes, I'm sorry, George Lopez was before Judge Cottrell, yes. Okay, and so they all were? Yes, your honor. At some point, Judge Gottschall seemed to indicate that it wasn't, those weren't her decisions. Yes, your honor, and that's what I'm getting at is, so three of them were given immunity. That's a discretionary decision by the U.S. Attorney's Office. Those were the Venegases and Ray Cockrell. So they were not in front of the court insofar as, you know, they had been provided immunity. The other individuals, because they were given 11 C1C deals, what the court is referring to about, you know, these are not my decisions, and this is a prosecutorial decision by the government to give them fixed 11 C1C deals. So an 11 C1C is an agreement that, a plea agreement is not valid unless that particular sentence or range of sentences is imposed. And so it's not just, okay. I thought the comment, I thought the comment was odd, though, because she had to approve each one of those, right? Yes, your honor, but the inquiry into the validity of that plea deal is different than the discretion that normally would be exercised at a sentencing of a cooperator with just a 5K reduction. And in fact, the defense in their sentencing memo specifically asked what he was asking the court to do, quote, take into account the sentencing consequences of the charging and plea agreement decisions of the government. So what the court is talking about at court in jurisdiction sentencing is, I don't know if I'm allowed to take into account these prosecutorial decisions. I don't know that that's a proper consideration for me, and in fact, it's not. But even if it were, as Judge Grosner noted, what she's remarking on is, I don't think that these sentences are a fair and reasonable resolution of the case, because they're rather short. Why would it be improper for the judge to consider the prosecutor's exercise of discretion with respect to other participants? Well, I think that what this court has said previously, although this is not something that was flushed out in writing here, but my awareness of the case law is that a district court where the prosecutor exercises legitimate prosecutorial discretion, that's not something that should be taken into account in sentencing. So maybe- Under what rule of law is provision of statute? More generally, it could, I suppose, absent a cooperator deal, which I'll address in one second. Absent a cooperator deal, it might form the basis of a 3553A6 analysis, the comparison of sentences, as we're talking about here. With respect to specifically cooperators, I mean, this court has made very clear that a district court is not required to, and in fact, there are interests that would require it not to, align sentences of cooperators with cooperators. Of course. You're not quite answering my question, which is what would prohibit a district judge from saying, in essence, the government has cut such generous deals with co-defendants or conspirators that I'm not going to hammer this defendant as hard as the government is asking me to? Why would that be unlawful? Because they're not similarly situated individuals for the purposes of A6. What prohibits the judge? We're talking about broad sentencing discretion. Multiple factors, considering the individual circumstances of the defendant, and a broader sense of how this crime and this criminal compare to other crimes and other criminals. I understand the concern. I understand what you're getting at. I think in the context of this argument, where it's raised to her as a high sentence, creating a disparity, her comments indicate a understanding of this court's case law under A6 that those individuals are not to be taken into account for the purposes of evaluating disparities, because that would be unsafe. Counsel, maybe I'm not being clear enough about this. You don't have to show that the judge was prohibited from taking those matters into account. I thought you had been making the argument in your brief that she understood the extent of her discretion, yet I'm troubled that she now seemed to be saying that the comments that the defense has picked up on were actually correct, that she was prohibited from considering those matters. No, I don't mean to be shifting that position. I would hope not. I don't see what prohibition you've got here. Right. I think that she understood her general obligation to consider other sentences. I think she also understood that these individuals, those specific seven individuals that have been identified, were not similarly situated. That's how I understand her comments to read. I also think that Judge Rovner's comments during the hearing… Which is why she said she didn't think she should consider them. I'm sorry? They weren't similarly situated, so… They should not be aligned, which is what this court said in cases like Gonzales last year and other cases. Those sentences do not need to be aligned. They don't have to be, no. But they can be taken into consideration. Right. And I think that her comments also indicate that they shouldn't be insofar as she disagreed with what those sentences were. They were really short. And she thought that… Yet she had proved them all, right? Except for the immunity deals. Yes. I don't know the timeline off the top of my head of when the approval for the… You know, a lot of these individuals had… Well, they… My recollection is that they weren't sentenced till afterwards. They're… Okay, I'm sorry. I'm trying to think through the timeline of the case. I think a number of those individuals had not been sentenced because they had the fixed sentences. Had the plea deal been accepted. That's the critical moment. Yes. Yes, Your Honor. I think that that's right. And as Judge Keeney had noted, the non-SWAT operator, for the most part, had not been sentenced. Only Cardenia and Sparkman at that point had been sentenced to it. Very different roles in the conspiracy from Jorge Gerardi, who… Although he's characterized as an average participant by Mr. Beal, that's in the context of discussing a leadership enhancement. And what the court found was that he actually had very substantial involvement in the conspiracy, including a murder, a number of very violent kidnappings that were… The violence was almost gratuitous in terms of its level of extent. The last issue that I believe that I'll discuss here is a lane issue. The government, as we know in our brief, doesn't concede that there was an error under a lane because there's no brandishing enhancement that was alleged in indictment or found by the jury. And yet they were sentenced as if there was. I think that the error is harmless on a number of grounds. So with respect to Hector Gerardi and Jorge Gerardi, they both received sentences that were far above the mandatory minimum. And the court's comments indicate that the mandatory minimum really did not come into play in any significant part. In one case, the gun was put to the guy's forehead, roughly. Yes, in the context of, you know, the… Might be considered brandishing. Right, right. Right, Honor. And that's with respect to Sparkman specifically, who I'll address in a moment. With respect to Gerardis, I also would note that one of them has a three 924C conviction. So even if one of them drops out, there's still a remaining conviction where you can get evidence to establish the brandishing on the basis of a very substantial record. Which is that? It is… Hector has three 924C convictions, Hector Gerardi. And so we've got three different episodes. Yeah, three different episodes. Count 6 is the beta kidnapping and the associated 924C. Count 8 is the Avila kidnapping and the associated 924C. And then Count 11 is the Kronza kidnapping and the associated 924C. Mr. Sparkman and George Gerardi both have two 924C convictions. The evidence as to Mr. Sparkman, who was sentenced to the mandatory minimum. I think the court comments do indicate that she felt constrained by the mandatory minimum. So there's no harmless error in that regard. He did not object to the imposition of a brandishing enhancement on the ground, however. So in addition to a normal harmless error analysis that looks at the record, this court would need to find a claim error that affects his substantial rights. I take issue with the defense counsel's characterization of the record as that there could be evidence of him possessing the weapon without brandishing it. So with respect to the Avila robbery, Sparkman, the testimony establishes he comes in. He knocked Mr. Avila to the ground. He gets gun in the back of his head while ordering him around around the house. That's not brandishing. And of course, but the question is, in essence, how clear and how strong that evidence is. There's sufficient evidence. Yes, Your Honor. I think that there I would characterize evidence from the trial on that question to be quite overwhelming. There are a number of individuals who testify about the events in question. There is not challenge to that aspect of the evidence. The argument at trial that was made by the defense was, he's not involved. He's being placed into this robbery basically by his court. He wasn't there at all. I think that that's the case, is that it was a pure innocence argument and not one, oh, well, if he was there, then, you know, he didn't brandish that weapon. That argument wasn't made at trial. It wasn't made at sentencing. There's very little discussion of that by the district court. But it's because there was no challenge to the idea that if he was there and he was found guilty of this, that he also brandished that weapon. And I think the record indicates a thorough review of that record would indicate that that's harmless there and does not warrant remand. If there are no questions from the panel, I would ask that this court affirm the defendant's sentences and conviction. Thank you, counsel.  Mr. McLeese. Yes, Your Honor. Two points. One, and I believe it was in response to Judge Roebner's questions about the government's evidence against Llewellyn that was independent of the testimony of the cooperating witnesses. And the government said at one point during that colleague we, that we had all of these cooperating witnesses. And earlier they said the evidence establishes this, only, however, if the cooperating witnesses are believed. And the government says the jurors chose to credit their testimony. That cannot be reconciled with the fact that the jurors did not vote unanimously to convict Llewellyn on the RICO charge. Because if they had credited their testimony as being sufficient to establish guilt beyond a reasonable doubt, he would have been convicted on that charge. Also, Your Honors, and I believe this was particularly raised by Judge Hamilton, the government misrepresents, and I'm not saying intentionally, the government had a massive record to deal with here, but the government misrepresents the extent of the communications between the government and the defense during the course of the trial regarding the government's ongoing intention to introduce summaries of Llewellyn's financial affairs pursuant to Rule 1006. In the judge's decision, she indicates that on December 12th of 2011, most of the evidence about Llewellyn's finances was presented. On December 17th, a Saturday, and this is attached as a government exhibit to Document 1072, which was one of the supplemental submissions the government filed at the direction of the court. There is an exhibit that is an email from the government to defense counsel dated that Saturday after these unobjected financial witnesses have testified, and the defense is expecting that these summaries are coming. And on the 17th, the email says, Matt, attach a please-finding draft to the summaries the government intends to introduce pursuant to Federal Rule of Evidence 106, and et cetera, et cetera, et cetera. I fully expect there will be changes to these drafts in the coming days, particularly with regard to how the information is presented. They will provide final versions of the summaries once they are available. In the meantime, please contact me if you have any questions or would like to discuss the information we plan to present. What they were doing, the representing that they were doing, was that they were essentially going to be presenting something that was similar to, if not a replica of, a net worth analysis. The defense failed to do that. The only other financial evidence they presented was on December 19th, two days after this email was sent. The only other thing they presented was evidence concerning Llewellyn's police department salary. So what the government, in effect, chose to do is to present the jurors with less evidence rather than a more complete picture. And then the government's coming to this court and asking that all of this be approved on an entirely different set of theories of probative value. Llewellyn, like every other defendant who comes into this building, deserved a trial that was reasonably reliable and fair. The government's handling of this issue, whether intentionally or not, and I understand the strategies can change, but whether intentionally or not, the government's handling of this issue had the effect of a big switch. And I submit that this court ought not give that kind of litigation test its impromptu. Thank you. Mr. O'Connor-Miller. Your Honor, two points to Llewellyn. First, on the issue of unexplained wealth, there were three forms of evidence in this trial against Hector Uriarte. He had cooperating witnesses and several Rodriguez was roundly criticized by the trial judge and, of course, by the government as being untruthful in their own sentencing factor memorandum related to Mr. Rodriguez. You had Mr. Vega, who has testimony about his kidnapping that directly contradicts Solomon Rodriguez's, something the government knew would happen when it got into the cross-examination of Mr. Vega. And then finally, you have the evidence of unexplained wealth. Without the evidence of unexplained wealth, this trial comes down to a lot of people who the trial court itself characterizes as being untrustworthy. Without the financial evidence, there's no way that a jury would have convicted Mr. Uriarte. What the government promised to do was provide tax returns from 2000 to 2009. Instead, what they provided were two financing applications and a mortgage application. But those only relate to a given year. The government did not provide any financial evidence that they promised to provide, promised the trial court to provide for the Carrera test. Counsel, both you and Mr. McLeese seem to be complaining the government didn't make a stronger case against your clients. I would disagree, Your Honor, because the issue, as I see it, is that Mr. Uriarte had legitimate income. It's not... Where was it? Sorry, go ahead. Where was it from? He was a roofer. He also performed other jobs as well. He did have the investment in Platinum Motors. And why couldn't you introduce that evidence? Your Honor, Mr. Uriarte chose not to testify on his own behalf. I mean, the government then commented on... Well, I guess in this gamesmanship you're talking about, did you raise this to the court? Yes, Your Honor. Mr. Uriarte filed a motion in limine and objected on the record. That motion was fully briefed. And essentially at the conclusion of that motion in limine, the government said we're going to provide tax records to the court for 2000 to 2009. And what happened when they didn't? We renewed our objection in our post-trial motion. Second, if I could briefly address the four cause challenge issue. This court has never precedentially ruled that an erroneous four cause challenge lacks prejudice. That there is a single ruling, United States versus Russell, that's unpublished. Could you address the Martinez Supreme Court's address? I agree, Your Honor, but that deals with a very different situation. In this case, both sides use all their perimetry challenges. And the concern here, we have an erroneous four cause challenge, both sides use all perimetry challenges, is it creates the risk of doing an end run around Babson versus Kentucky. And that's the real fear here. In this unique situation where all perimetries are actually used during jury selection. Is there a claim that this jury was not impartial? There is a claim that we would have ended up with a completely different jury. That's not my question. Is there a claim that the jury was other than impartial? There is no claim the jury was other than impartial. Thank you. Thank you, Your Honor. Thank you, counsel. Mr. Beal. Two brief points. The Judge Gottschall said in the sentencing, the decision to give these people, I find rather frightening sentences, which I view as rather short, was not my decision. And at least to the extent of the 11 C1Cs, they were her decision. There are districts such as St. Louis and Brooklyn that don't accept 11 C1Cs, period. And in another case, Vance's case. That's not the law in this circuit. Well, no, it's not the practice. It's not the practice. This is a practice in those districts that the judges don't, this is what the prosecutors tell me in cases I've handled in those districts. And we don't, the judges in our district do not accept 11 C1Cs. And the other law is the practice of some courts not to have cell phones and other things too. Yes, but she has to accept the plea. And in fact, in a case in her courtroom shortly later, she withheld entering judgment until the day of sentencing, rather than at the day the plea was entered. So it was her decision. The only other thing that I want to say is that the government snuck in this murder involving Jorge Moriarty, which is a fiction. The government's brief, the district court rejected that, didn't she? Excuse me? The district court rejected that. That the, they stayed in there, the district court never found the murder. They didn't necessarily find, the district court didn't find. And in their brief, they say the court also clarified that Jorge Moriarty was involved in one murder. They cite to page 26, the court did not, if you read the site, the court did not find that there was a murder. So I just wanted to clarify that. In other words, Jorge is not a murderer, and that bears on the seriousness of his conduct. Thank you. Thank you, Mr. Bail. Mr. Gabel? Two brief points. First, the government cites to the 801D rule for Healy being able to testify about the clear hearsay of the identification by Avila. They cite to the Foster case, but that ignores, in Foster, this court specifically stated, government agents may only testify to a witness's prior statement of identification when the witness forgets or changes his testimony at trial. What's the basis for that, given the language of the rule? I believe to prevent situations just like this, where they can do an end round around. That's not the purpose, but the legal basis for that additional requirement that's not in the rule. I do not know the, I can brief that about what the legal requirement is. My understanding, though, is to prevent a situation where the government calls witnesses, they don't do the identification, then they can put a government agent, who's more difficult to cross-examine, may be seen more beneficial by the jury to do that identification, which is exactly what happened here. Secondly, with the Allent issue, the government argues that, you know, Sparkin made no argument that there was no brandishing, but that was never charged in the indictment. There was no argument to make. And further, the evidence is not as clear as they like to say of that. Mr. Avila was the only witness, non-cooperating witness, and there was confusion about how many people were there, people had masks, how many people were downstairs, how many people were upstairs. And based upon that, I believe the Allent, Mr. Sparkin should not be convicted for brandishing. Thank you. Ms. Moonsall? The government stated in its argument that when the statement that was admitted against Mr. Cardino was sanitized to remove the names of the other defendants, it lost some relevance. In fact, it lost all relevance. When the statement was admitted to just simply state that Mr. Cardino asked whether or not he could provide information about other individuals, it became simply a statement that was intended to show that he was a bad guy, that he knew criminals. It was not, because it was so sanitized, it was no longer inculpatory. And in answer to Ms. Judge Roedner's question, it was no longer a statement against interest because it had no relevance to this case at that point. Thank you. Thank you. Thanks to you all, counsel. The case will be taken under advisement.